# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## STATE OF TENNESSEE v. HERMAN MCKINLEY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-04050      Lee v. Coffee, Judge**

---

**No. W2012-00050-CCA-R3-CD  -  Filed June 20, 2013**

---

The defendant, Herman McKinley, was found guilty by a Shelby County jury of second degree murder, attempted first degree murder, two counts of aggravated assault with a deadly weapon, employing a firearm during the commission of a dangerous felony, and unlawful possession of a handgun as a convicted felon. Following a sentencing hearing, he was sentenced to an effective term of one hundred thirty-one years in the Department of Correction. On appeal, he challenges the sufficiency of the convicting evidence and the imposition of consecutive sentencing. Following review of the record, we affirm the convictions and sentences as imposed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and JEFFREY S. BIVINS, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal) and Jim Hale (at trial), Assistant Public Defenders, for the appellant, Herman McKinley.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Eric Christenson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History and Factual Background

The defendant's multiple convictions in this case arose from two separate, although related, shootings which occurred on September 23, 2009, at the Claiborne Holmes Apartments in Memphis. Multiple witnesses testified about the two shootings, and certain

discrepancies were noted in the various testimony. However, the general testimony offered, with the exception of the defendant's, established that the defendant approached Laquita Turner and Jimmie Williams outside Ms. Turner's apartment and began an argument because his girlfriend refused to exit the apartment. After leaving the scene, the defendant returned with a gun and fired one bullet between Ms. Turner and Mr. Williams, although neither party was wounded. The defendant then left the area again, and police were called to the scene to investigate. After the police left the scene, the defendant returned and was heard threatening Mr. Williams. He approached the area where Mr. Williams was assisting a neighbor with his automobile and began firing the gun. In the fray, seventeen-year-old Toby Gladney was shot and later died as a result of a gunshot wound to the back.

At the defendant's trial, Laquita Turner testified that she lived with her mother in the Claiborne Holmes Apartments where the incident occurred. She testified that she first saw the defendant on the evening of September 23, 2009, when he was peeking through her mother's apartment windows looking for his girlfriend, who was inside. When Ms. Turner told him to stop, he told her to tell Tracy, his girlfriend, to come outside. Tracy did not come out of the apartment, and the defendant left. Shortly thereafter, Ms. Turner was on the porch talking with Mr. Williams when the defendant returned. Ms. Turner told him that Tracy had gone, but the defendant accused Mr. Williams of "messing with" Tracy. Mr. Williams explained to the defendant that he was there speaking with Ms. Turner, not Tracy. The defendant walked away only to return five to ten minutes later. This time the defendant was brandishing a gun, which he fired once at Ms. Turner and Mr. Williams. Ms. Turner, who was four months pregnant at the time, testified that she saw fire and felt the heat as the bullet passed her. According to Ms. Turner, she heard the bullet pass her and hit the brick wall behind her. After firing the shot, the defendant again walked away. Police were called to the scene.

Ms. Turner testified that they never threatened the defendant and that neither she nor Mr. Williams were armed. Officer Timothy Williams responded to the scene and spoke with both Ms. Turner and Mr. Williams, who each identified the defendant as the shooter. Officer Williams was on the scene approximately thirty minutes investigating. He was unable to recover any shell casings. Mr. Williams told Officer Williams that the defendant was employed at a nearby McDonald's, and the officer left the apartment complex to go there. Shortly after arriving at McDonald's, the officer received a second call regarding shots fired at the Claiborne Holmes Apartments and returned to the scene.

During the interim after Officer Williams left the apartments, Ms. Turner and her mother were sitting on their porch outside the apartment. They observed Mr. Williams across the walk where he appeared to be working on an automobile. Several other individuals were also in the area. The two women then observed the defendant reappear from the direction

from which he had left previously. As the defendant came around the corner, they observed that he had a gun, which he cocked and raised, as he advanced to the area where Mr. Williams and others were located. Ms. Turner heard the defendant say, "Y'all want it with me? Y'all want it with me?" She testified that several shots were then fired by the defendant. She also related that she saw no other weapon besides the gun which the defendant was firing. Once the shooting began, Ms. Turner retreated inside the apartment for safety reasons.

Jimmy Williams also testified at trial and confirmed that he was at the apartment complex when these events occurred. He was not a resident of the apartment complex but was there visiting his aunt. He did confirm that he was speaking with Ms. Turner outside her apartment. However, he testified that he and the defendant approached the apartment at the time time and that Tracy was also outside. Mr. Williams testified that he did speak casually with Tracy. Mr. Williams indicated that the defendant asked him to whom he was talking. Later, the defendant approached him and told him that "if you're messing with my girlfriend, it's going to be a misunderstanding." After this, the defendant disappeared behind the apartment complex. According to Mr. Williams, the defendant was agitated and was muttering you "motherf*****s are going to learn me." Mr. Williams stated that he did not chase or threaten the defendant in any way. Shortly thereafter, the defendant returned with a gun, threatened Ms. Turner's mom, then pointed at him and shot. Ms. Turner was beside him while this occurred. Mr. Williams stated that he was terrified and did not see where the bullet had gone. The defendant remained in the area saying he was going to kill somebody, but he finally disappeared when he was told that the police had been called.

Afterwards, Mr. Williams testified that he was scared and angry. While he was outside, Mr. Courtney Oliver asked Mr. Williams to help with his car. Mr. Williams agreed, and the cars were positioned, hood to hood, with both hood raised. Thereafter, he saw the seventeen-year-old murder victim, Mr. Gladney, approaching the area and then heard shots fired. Mr. Williams testified that he did not actually see the defendant shoot but afterwards saw the defendant running from the scene. Afterwards, Mr. Williams observed Mr. Gladney, his nephew, lying on the ground with a gunshot wound. According to Mr. Williams, Mr. Gladney did not have a gun in his possession when he approached. Mr. Williams testified that after the shooting, someone did hand him a gun. He stated that he just dropped it in the parking lot. Mr. Williams testified that he never threatened the defendant or pointed a gun at him. He also stated that he never asked Mr. Gladney to bring a weapon to the area.

Courtney Oliver testified that he also lived in the apartment complex and was present on the day of the incident. Mr. Oliver was outside installing an alternator on his vehicle when he saw the defendant and another individual standing by the drainage ditch. Mr. Oliver indicated that they disappeared and then the defendant reappeared beside the building where

the initial shooting occurred. Mr. Oliver did not witness the defendant fire the gun, but he did hear the shot. Mr. Oliver did see the defendant walking away and heard him say, "I'll kill you bitches." Prior to the arrival of the police, Mr. Oliver also heard Mr. Williams making threats as well. On cross-examination, Mr. Oliver said that Mr. Williams called Mr. Gladney and requested that he bring him a gun.

Later, Mr. Oliver asked Mr. Williams to jumpstart his vehicle, and Mr. Williams agreed. Just as they were getting ready to disconnect the jumper cables, Mr. Oliver saw Mr. Gladney approach carrying a shotgun, which he gave to Mr. Williams. Mr. Oliver did not know whether the gun was loaded, and he testified that he never saw the shotgun fired. He also stated that neither Mr. Williams nor Mr. Gladney were making any threats toward the defendant at this time. Thereafter, he saw the defendant come around the side of the building walking towards Mr. Williams. The defendant fired five or six shots, one of which struck Mr. Gladney. The defendant then laughed and walked away.

Raymond Jones was also present at the time of the second shooting. He saw the defendant approach and fire his gun, one bullet striking Mr. Gladney. Mr. Jones said that he did not see either Mr. Williams or Mr. Gladney with a gun. He also testified that he did not hear any threats made by Mr. Williams prior to the shooting.

Mr. Eugene Williams testified that he was hanging out with his friends that night and saw a group of people working on a vehicle in the parking lot. He testified that he saw Mr. Gladney approach the group carrying a shotgun, which he was holding down by his side. At that point, he heard gunfire but was not able to see the shooter from his vantage point. He testified that he did not see anyone point the shotgun before the shots were fired and that he did not hear any threats. After the shooting stopped, he did observe someone pick up the gun and point it in the direction from which the shots had been fired, but it was never fired.

Mr. Eugene Williams further testified that he had been at the apartment complex for several hours prior to this shooting, but he denied that he had heard a prior gunshot. However, he did state that he heard someone talking to the police earlier and thought it had to do with an argument over a girl. He did see a man, whom he did not know, in the parking lot after the police left who appeared to be angry, although he did not hear any specific threats.

Jameda Frazier testified that she was visiting her sister who lived in the complex when the shooting began. She had just arrived in the parking lot and was attempting to get her two small children out of the car when she heard the shots. She grabbed her children and ran into her sister's apartment. According to her testimony at trial, she told police that she heard either Mr. Gladney or Mr. Williams state they were "fixing to kill him" prior to the shooting.

-4-

However, she acknowledged that in her statement to police, she had said this statement was made after the shots were fired by the defendant.

When police officers returned to the scene, they found the victim, still conscious, lying on the ground in front a vehicle suffering from a gunshot wound. Officers tried to stop the bleeding, and an ambulance was called. Mr. Gladney was transported to the hospital where he later died. Officers began to investigate at the scene. They discovered that a bullet had hit the car, which was parked near the victim, under the hood, which was open. They also discovered that a second bullet had hit an apartment window and broken it. No shell casings or weapons were found on the scene. Some witnesses at the scene did indicate that they saw someone put a weapon in the trunk of Mr. Williams' car, and a search of the vehicle was conducted with Mr. Williams' consent. No weapon was found.

Dr. Karen Chancellor, a Shelby County medical examiner, performed the autopsy on the victim, Mr. Gladney. She concluded that the victim died as a result of a gunshot wound to the torso which had entered the body from the back.

The defendant testified in his own defense. He stated that he was a resident of the apartment and came into contact with Mr. Williams, whom he did not know, earlier in the day. According to the defendant, he ran into Tracy, whom he barely knew and who was not his girlfriend, when Mr. Williams approached her from behind and said "what the f*** is going on." The defendant said Tracy flinched and walked away. Afterwards, Mr. Williams "got in his face" and said "that's my hoe." Later, as he was going to the store, he saw Mr. Williams on his cell phone. He also testified that he met Ms. Turner, but they did not speak. According to the defendant, he then proceeded to the store and remained there for twenty to thirty minutes. He denied the first altercation and shooting as described by the State's witnesses ever occurred.

The defendant testified that on his way back from the store, he met some friends who asked him what was going on, "what's up with the guy from Arkansas?" According to his friends, Mr. Williams was "mouthing out" and threatening to harm the defendant. Although the defendant was not sure he believed his friends, he nonetheless took the 9mm gun they offered and put it into his back pocket. The defendant stated that once he returned to the apartments, he approached Mr. Williams and asked him, "what do you want to beef about?" At that point, according to the defendant, Mr. Gladney pointed the shotgun at him, and the defendant drew his gun and fired. He was adamant that he only fired his weapon because the shotgun was "leveled" at him. The defendant fled the scene.

Based upon his actions on September 23, 2009, the defendant was indicted by a Shelby County grand jury for: (1) first degree premeditated murder of Mr. Gladney; (2)

attempted first degree premeditated murder of Mr. Williams; (3) two counts of aggravated assault with a deadly weapon against Mr. Williams and Ms. Turner; (4) employing a firearm during the commission of a dangerous felony; and (5) unlawful possession of a handgun as a convicted felon. Following a jury trial, at which the above evidence was presented, the sequestered jury received the relevant jury instructions, including those on self-defense. After deliberations, the jury found the defendant guilty in Count 1 of the lesser offense of second degree murder. He was convicted as charged of the remaining five offenses. The State notified the defendant of its intent to seek enhanced sentences based upon his prior convictions and filed a motion for consecutive sentencing. A sentencing hearing was held, and the trial court imposed the following sentences: (1) forty years at 100% for second degree murder; (2) forty years at 35% for attempted first degree murder; (3) fifteen years at 45% for each of the two aggravated assault convictions; (4) fifteen years at 100% for employing a firearm during the commission of a dangerous felony; and 5) six years at 45% for possession of a handgun as a convicted felon. Based upon the imposition of consecutive sentencing, the defendant is serving an effective sentence of one hundred thirty-one years in the Department of Correction.

The defendant filed a motion for new trial in the case. Following a hearing, the trial court, by written order, denied the motion. The defendant has now timely appealed that denial.

## Analysis

On appeal, the defendant raises two issues for our review. First, he challenges the convicting evidence with regard to five of his six convictions. He does not challenge the sufficiency of the evidence with regard to his conviction for being a felon in possession of a firearm. The defendant also contends that it was error for the trial court to impose consecutive sentencing in his case.

### I. Sufficiency of the Evidence

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[O]n appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Dorantes*, 331 S.W.3d at 379 (internal quotation omitted). It is the trier of fact who resolves all questions of witness credibility, the weight and value of the evidence, as well as all factual issues raised by the evidence. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Reviewing courts

should neither re-weigh the evidence nor substitute their own inferences for those drawn by the jury. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

The trial court's approval of the jury's verdict accredits the State's witnesses and resolves all conflicts in the evidence in the State's favor. *State v. Moats*, 906 S.W.2d 431, 433-34 (Tenn. 1995). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules apply whether the verdict is predicated upon direct evidence, circumstantial evidence, or a combination of both. *Dorantes*, 331 S.W.3d at 379.

Again, the defendant in this case was convicted of second degree murder, attempted first degree murder, two counts of aggravated assault, employing a firearm during the commission of a dangerous felony, and being a felon in possession of a handgun. Second degree murder is the unlawful killing of another. T.C.A. § 39-13-201, -210(a)(1) (2010). Our statute defines "knowing" as follows:

> "Knowing refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."

T.C.A. §39-11-302(b). First degree murder is a premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). A person engages in the criminal attempt to commit a crime when he commits any of the following:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). As relevant here, a person commits an aggravated assault by causing bodily injury, or creating the reasonable fear of impending bodily injury, with the use of a deadly weapon. T.C.A. § 39-13-102. Further, a person who employs a deadly weapon in the course of an attempt to commit first degree murder commits a Class C felony. T.C.A. § 39-17-1324(i)(1)(a).

The defendant's argument regarding the sufficiency of the evidence supporting his convictions for second degree murder and attempted first degree murder are based upon his claim of self-defense. While acknowledging that the issue of self-defense is a matter for the jury to decide, *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1991), the defendant contends that, despite the guilty verdict in this case, the evidence presented established that he had a reasonable fear for his life when he shot Mr. Gladney. He contends that the established facts are: (1) that a verbal confrontation with Mr. Williams has occurred; (2) that the defendant was warned by his friends that Mr. Williams was making threatening remarks; (3) that either Mr. Williams or Mr. Gladney was armed with a "short black shotgun" at the time of the shooting; and (4) that the shooting took place in the courtyard where the defendant lived. These facts he contends support a conclusion beyond a reasonable doubt that his theory of self-defense was established. Moreover, he asserts that "[e]ven in the absence of a legally sufficient self-defense claim the proof showed that [the defendant] is guilty of voluntary manslaughter because the evidence shows he was adequately provoked. *See* T.C.A. § 39-13-211(a). He contends that "[a]t most this incident was a confrontation between two men who were equally at fault."

With regard to the two aggravated assault convictions based upon the defendant's actions against Ms. Turner and Mr. Williams, he contends there is no proof in the record to establish this shooting occurred "[e]xcept for the incredible testimony" of the victims. He also relies upon the State's witness who testified he had been in the area and heard nothing, as well as the failure to procure any physical evidence from the scene such as a shell casing. Finally, with regard to his conviction for employing a firearm during the commission of a dangerous felony, the defendant urges that if this court concludes that his murder and attempted murder convictions should be reversed, this conviction must also be vacated because there is no underlying dangerous felony remaining to support this conviction.

The defendant's argument is essentially no more than a credibility challenge to the testimony and evidence which was presented to the jury. He does not complain that the state failed to prove any elements of the offenses with regard to second degree murder or attempted first degree murder; rather, he simply asks this court to reevaluate the jury's determination that self-defense was not established. There is no question that the defendant's theory of self-defense was placed squarely before the jury and that they were instructed upon that theory by the court. The defendant relies upon facts to support his argument which were

introduced in large part by his own testimony of the events which occurred at the apartment complex. The jury heard that testimony and chose not to accredit the defendant's version of events. Contrary to the defendant's request, it is not the province of this court to reevaluate credibility determinations made by the trier of fact. *See Pappas*, 754 S.W.2d at 623. The jury heard the defendant's testimony that he fired in self-defense and, based upon their verdict, found it lacking in comparison to the testimony from numerous other individuals on the scene.

Likewise, the defendant's argument with regard to the two convictions for aggravated assault is based upon credibility. He asks that this court ignore the "incredible" testimony of the two victims, Ms. Turner and Mr. Williams, to determine that no evidence exists in the record to support that these crimes occurred. Again, that it not the function of this court. Both Ms. Turner and Mr. Williams testified at trial that the defendant pointed a gun between them and fired a shot, narrowly missing them. Ms. Turner's mother also provided testimony regarding the incident. That there is some discrepancy in the details of the events is not fatal to the case. Those discrepancies were heard by the jury and were pointed out by defense counsel on cross-examination. On appeal, it is the State who must be afforded the strongest legitimate view of the evidence. *See Dorantes*, 331 S.W.3d at 379.

Clearly, viewing the evidence in the light most favorable to the State, sufficient evidence was presented to allow a rational trier of fact to determine that the defendant committed the crimes for which he was convicted. The defendant approached Mr. Williams and Ms. Turner, and an argument ensued over the defendant's girlfriend who was inside the apartment. The defendant became agitated but left the apartment area but not before threatening remarks were made. He returned a short while later and fired a gun at Ms. Turner and Mr. Williams before again departing the area.

Shortly thereafter, the defendant was seen returning by multiple witnesses to the area carrying a gun. He approached a group of individuals with the gun pointed and fired multiple shots into the crowded parking lot, one of which killed Mr. Gladney. The defendant does not dispute that he in fact possessed the gun and that he shot Mr. Gladney. His only argument is one of self-defense. However, as noted above, the jury has concluded that the defendant's actions were not in fact justified. We conclude, as did the trial court, that the evidence is sufficient to support the convictions in this case.

## II. Consecutive Sentencing

The defendant also contends that the trial court erred in ordering that his sentences be served consecutively. A defendant may appeal from the length, range, or the manner of service of a sentence. T.C.A. § 40-35-401(a). We review a trial court's decision regarding

the length of a sentence for an abuse of discretion, granting a presumption of reasonableness to within-range decisions that reflect a proper application of the purposes and principles of the Sentencing Act. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id*. at 706. The trial court in this case applied multiple enhancement factors and imposed the maximum sentences within the range for each of the defendant's convictions. The defendant does not dispute the length of his sentences, and we agree the sentences were properly imposed; rather, he challenges only the trial court's imposition of consecutive sentencing.

Under Tennessee Code Annotated section 40-35-115, a trial court may impose consecutive sentences if it finds it finds by a preponderance of the evidence that any one of the following is established:

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . [or]

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

T.C.A. § 40-35-115(b). A single factor will support consecutive sentencing. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995); T.C.A. § 40-35-115. For instance, a finding of an extensive criminal history alone justifies the imposition of consecutive sentences. *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). However, when imposing consecutive sentences solely on the basis that the defendant is a dangerous offender demonstrating little or no regard for human life and no hesitation in committing a crime in which the risk to human life is high, the trial court also must find that consecutive sentencing is "reasonably related to the severity of the offenses" and is necessary to protect society from further aggravated criminal conduct by the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (citing *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995)). Consecutive sentences must also comport with the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2) & (4).

On appeal, the burden is on the defendant to show the impropriety of the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Cmts; *State v. Goodwin*, 143 S.W.3d 771, 783 (Tenn. 2004). In the *Bise* case, a case which involved concurrent sentencing, our supreme

court did not directly address whether the abuse of discretion with a presumption of reasonableness standard of review is to be applied to a court's decision to impose consecutive sentences. *See Bise*, 380 S.W.3d at 682. However, the court has cited with approval *State v. Henry Floyd Sanders*, No. M2001-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App., Oct. 9, 2012), *perm. app. granted*, (Tenn., Feb. 15, 2013), in which this court cited to the *Bise* language in stating the applicable standard of review on the issue of consecutive sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Moreover, the *Bise* court also stated that "when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the 'presumption of correctness' ceased to be relevant." *Bise*, 380 S.W.3d at 708. While other panels of this court have held otherwise, *See, e.g.*, *State v. Ricky Earl Genes*, No. M2012-02284-CCA-R3-CD, 2013 WL 1395290, at *6 (Tenn. Crim. App., Apr. 8, 2013), we conclude that the imposition of consecutive sentencing should also be reviewed under the abuse of discretion standard with a presumption of reasonableness set forth in *Bise*.

In imposing consecutive sentencing in this case, the trial court made the following extensive findings of fact on the record:

> This Court does find that the defendant is an offender. His record of criminal activity is in fact extensive, not only as a juvenile. Not only is extensive but is violent. Not only crimes against property but against people. His record as an adult is extensive. He has been convicted in other states for which the defendant has been found guilty by this jury of being a convicted felon in possession of a handgun and the Court does find that his record of criminal activity is extensive. It is one of the most extensive, frankly, that this Court has seen as a juvenile. And anytime, the only time apparently that [the defendant] does not commit crimes is when he's locked up, but when [the defendant] is out of the streets of Shelby County or other states, [he] has continued to commit crimes against states across this country and his record is extensive.

> This Court also finds, as indicated earlier, that he is a dangerous offender whose behavior indicates little or no regard for human life. And has no hesitation about committing a crime in which the risk to human life is high. . . . This defendant . . . has a history of committing robberies, violent crimes against people, crimes against property. Has a history of committing aggravated assault offenses and been convicted three times or been a convicted felon in possession of a handgun with a violent history. And this Court does find, given the history and given the facts of this case, when [the defendant] fired a gun between two people, and the testimony from Mr. Williams and Ms.

Turner indicated that they were out on the sidewalk, outside of Ms. Turner's mother's home just talking when the defendant walked up with a [gun], stood a few feet from them and fired a gun at close proximity to them. They both testified, particularly Ms. Turner, that she could feel the heat of the bullet as it passed between them and she does not know how that bullet missed them. This defendant left this location and came back a few minutes later and continued to fire a semiautomatic weapon at a group of people. Striking cars, striking apartments, killing a seventeen year old kid when he tried to kill Jimmie Williams. And this Court finds that he is a dangerous offender whose behavior indicates little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was in fact high. This Court also finds, pursuant to [*State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995)], . . . that the circumstances surrounding the commission of this offenses are in fact aggravated and that the (Indiscernible) reasonably relates to the severity of the offenses for which the defendant stands convicted and that consecutive sentences are necessary to protect the public from future criminal acts of the defendant. . . . And this Court does find under the *Robinson* case and under the *Wilkerson* case that consecutive sentences are absolutely necessary in this case. [The defendant] is thirty-three years old and for twenty plus years he had been committing violent crimes against the State of Tennessee, against Iowa. And had somebody at some point put [the defendant] where he's been begging to go for a long period of time, he's been begging judges to please put him in prison for a long period of time, if somebody would have done that, Toby Gladney may not have been killed. He might be alive had somebody taken [the defendant] off the streets and put [him] in a position where he could not harm anyone, but unfortunately, for thirty-three years, twenty some odd years, at the age of thirty-three, [the defendant] has continued to commit crimes and has continued to be allowed the privilege of being in and out of prison until, unfortunately, a child was killed and for all those reason, the Court is firmly of the opinion that consecutive sentences are warranted in this case because of the facts, because of his history and because of Tennessee law. . . .

Based upon our reading of its findings, we conclude that the trial court found consecutive sentencing appropriate in this case based upon the fact that the defendant: (1) had a record of criminal activity which was extensive; and (2) that he was a dangerous offender. In his brief, the defendant contends that the court erred by finding him to be a dangerous offender because the court failed to articulate "any aggravating circumstances" which justify the imposition of consecutive sentences.

The defendant apparently makes no challenge to the court's finding that his record of criminal activity is extensive. As noted above, this finding alone supports the imposition of consecutive sentencing. *See Adams*, 973 S.W. 2d at 231. Moreover, the record more than supports that the trial court did not abuse its discretion in reaching this conclusion. The court in great detail summarized the defendant's prior record which by any definition would be considered extensive. The crimes committed by the defendant included multiple driving offenses, being a felon in possession of a handgun, vandalism, thefts, robberies, and assaults. The court also specifically noted that the defendant was also charged and pled guilty to robbery as a sixteen-year-old in criminal court following a transfer based upon his already extensive juvenile record, with his first arrest occurring when he was twelve years old. We conclude there was no abuse of discretion in the trial court finding the defendant to be an offender who had an extensive criminal history.

Although unnecessary based upon our conclusion above, we nonetheless note that the trial court also did not abuse its discretion in determining that the defendant was a dangerous offender. Again, the defendant contends this finding was error because the trial court failed to specify "aggravating circumstances" which justified imposition of consecutive sentencing. He appears to argue that because the "dangerous offender" category is subjective and difficult to apply, it should only be applied based on the presence of "aggravating circumstances" surrounding the crimes for which the defendant is being sentenced. The defendant cites to *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976), and *State v. Lambert*, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987), in support of this argument. However, the cases relied upon by the defendant were superseded by *State v. Wilkerson*, in which the supreme court considered the issue of consecutive sentences based on the "dangerous offender" classification in light of the Criminal Sentencing Reform Act of 1989 and held that "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed" without making any mention of the need for a finding that any additional aggravating circumstances accompanied the crimes. *Wilkerson*, 905 S.W.2d at 939. Thus, the trial court was not required to make such a finding in this case.

In this case, the trial court expressly stated that it found that both *Wilkerson* factors were satisfied in this case. The court considered the principles of sentencing and the circumstances of the crimes in reaching its conclusions, which were adequately articulated on the record. The facts of this case amply support the findings made by the trial court. The defendant approached two unarmed people and initiated a dispute based upon his girlfriend's conduct, which eventually led to the defendant retrieving a weapon and firing directly between Ms. Turner and Mr. Williams. The defendant returned to the apartment complex

and began randomly shooting in an area which was heavily populated with people, including two small children.  His actions resulted in the death of a seventeen-year-old young man.  The court could not reach any conclusion other than that the defendant had no meaningful respect for, and no hesitation about committing a crime that risks human life.  The defendant's claim that the trial court erred by ordering him to serve his sentences consecutively is denied.

## CONCLUSION

Based upon the foregoing, the judgments of conviction and resulting sentences are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE